Mr. Prouty? Good afternoon, Your Honor. Good afternoon. You've reserved five minutes for rebuttal, correct? I have indeed. Okay, and I know you're well familiar with the lighting system, or the warning system, I'll say, so go ahead. Thank you, Your Honor. I may have a little bit of judgment in this case on three grounds. First is that the CAC, or CAC, was not a CDA, or Contract Disputes Act, contract. The second, that the Court's finding of a breach of the CAC was not based upon a finding of bad faith on the part of the government. And third, and dispositive, of course, is the Court's finding of duress in Amendment 3 was unsupported by the evidence before the Court. And we'll address Amendment 3 first. Could you help me? In reading the briefs, I'm not clear what regulation services are. I understand there's variability in the power demands when WAPA here was not providing, was not the power provider, that was somebody else, right? That's correct, Your Honor. And what do they have? They have generators that kick in when there's a particularly high need for power. Is that what providing regulation services is? To some degree, Your Honor. I'll step back for a moment, and I'll show you a bigger picture, if that helps. There is a control area, that is an area which the WAPA was responsible for, the WALC, the Western Area of North Colorado. And that area is a place where you essentially can tap onto it to get power. And there has to be kept a certain voltage in order to provide power. And the way you keep that voltage across this control area is that you have a matching of the power provided by external sources, such as generators, either in the water or outside of it being brought into it, and the power being pulled out. So you always have essentially the same amount of voltage available, in a sense, whenever somebody taps upon it. But what are the regulation services? What does WAPA do when it provides regulation services? What it does is it essentially provides the ability to spin up power, or take power down. And how does it do that? It does that by bringing or taking water offline its own generation sources, for example. Okay, so the concern here was the wear and tear on the WAPA generators as a result of the considerable fluctuation in demand, which was unusual as to this steel plant, right? There was one concern about it. There was others. You have to have a capacity available set aside for regulation. That is, if you're going to have a POP, you might have 80 megawatts of demand suddenly thrown onto the system. You have to have the ability to sort of bring that 80 megawatts online to sort of meet that demand. So what was the difficulty in computing the costs here? Was that because WAPA hadn't provided previous regulation services similar to this one? Nothing similar to that, Your Honor. That is, nothing of the same scale. That is, the WALC had a certain size, a certain typical megawatt load upon it. And the variation would vary about one and a half or three percent of the demand at the time generally in a typical hour. And what you had here was the addition of a plant that was so large and its demands were so large that you might have, say, a 30 megawatt need and all of a sudden a 100 megawatt need almost with a flip of a switch. But that was of a scale that WAPA did not have any experience dealing with. So what costs weren't available to compute a cost-based figure? Was it the cost-based resulting from the wear and tear on the equipment? What are we talking about? That was certainly one part of it, Your Honor. That is, they just did not know how this was going to affect, for example, the turbines at Hoover Dam, which would be most affected by the demand. Well, what other components are there? The other large component of cost, Your Honor, is the capacity cost. And that is essentially, how much do you need to have on standby? Experience-wise, how much does this... So the capacity that you couldn't use to sell power to other people, you mean. You had that available for using in this, yes, Your Honor. So those are the two cost components. Those are the two largest cost components. Okay. At the negotiations, did the contractor propose a cost-based methodology? Are you talking about negotiations originally back in 1994? Well, no, I'm talking about after the original contract was entered into. Yes, Your Honor. The negotiations that the contractor asserts weren't conducted in good faith. Yes, Your Honor. We would suggest that the contractor really didn't have a counteroffer or countersuggestion, which the government did. That is, the government had several iterations. Does the contractor claim to have presented a cost-based methodology at that point? Well, the contractor claims that, well, as far as briefs, what they have said is that they would demand proof of costs, but they never really talk about much of this offering in terms of what they are willing to do. If you look at... Briefs? I don't understand briefs. I'm sorry. As far as the briefs in this before the court right now. Well, I'm not going to forget about that for the moment. I'm talking about during the negotiations. They presented, you talked to them, you presented a proposal, right? They presented a proposal. Was their proposal cost-based? No, Your Honor. Their proposal was $57,000 managerial fees, and that was it. They said that we feel like you cannot prove anything besides managerial fees. They had a notion that because they were providing more power in blocks than was required under the contract, that that counts to regulation, which ample evidence suggested it did not, and that, therefore, the only firm option they proposed was a $57,000 offer. Now, what did you propose? Well, we had several different proposals. The first proposals were in October of 1997. It was that here are some ideas we want to talk about and notions we were going to go in the first meeting they had subsequent to the operational beginnings in July of 1997. And we were going to look at these different factors. When it became clear that we would not be able to get individual unit information from the Bureau of Reclamation, because we went there and we didn't have it, we didn't have cost information, which would allow incremental determination of cost. Cost information with respect to the wear and tear and the capacity. That's right. There was not the incremental information from the Bureau of Reclamation that would be helpful for this. It could not be used in such a way. They had system-wide information, but that cannot be allocated to the cost of regulation. As a result, the question was, well, how else do we do a cost-based analysis? And that was when, in January, other alternatives were offered by Western and had several iterations. They provided them. They're in the record indicating here's our thoughts. Please come back to us. Mr. Craig, let me ask you about the statement here in the decision of the Court of Federal Claims. At page JA36, where the Court is sort of framing the issue, it says, the contract could be breached if a cost-based methodology was not utilized by WAPA or if one of the parties failed to negotiate in good faith. Well, certainly, obviously, that's correct in the latter point, that if you don't negotiate in good faith, you breach the agreement. Yes, Your Honor. But what do you understand the Court to be meaning when it says, if a cost-based methodology was not utilized by WAPA? Well, we disagree with the Court's determination that if a cost-based methodology was not used by WAPA, that that was a breach of the contract. Because what's required is that they attempt to do so by negotiating in good faith. And the cases which talk about the requirement to negotiate in good faith and agreements to agree, like we have here, say that the way you breach is by not negotiating in good faith. And all the evidence is is that WAPA thought it was approaching a cost-based methodology. And another Court's expert said the methodology ultimately used by WAPA was not a cost-based methodology. But that doesn't mean that they weren't trying to do so. Nobody had really done it before in this sort of context. In fact, the trial court cites all three experts who testified on the case as saying there is no universally agreed upon method of coming to an agreement here about how to do a cost-based methodology. You would agree, though, that if, in fact, WAPA had cost-based methodology or information pertinent to formulating a cost-based methodology, and either it didn't act on that or it didn't disclose it in the negotiations and so forth, that that would be a breach of the obligation to proceed in good faith. I think if that information, which you believe was necessary for formulation of cost-based methodology, had it intentionally withheld it, that would certainly be something that we found to be the basis for bad faith. Now, let me ask you one other thing here. The judge also found that there was duress with respect to Amendment No. 3, the signing of Amendment No. 3, I guess. And if you lose on the issue of bad faith, does that mean you lose on that issue, too? It does not. And the reason is because there are three components of duress. And it's important, because that's the fourth thing about this bill, versus fear of the law. The first is that one party acted contrary to what it wanted to do. We agree that there is privatization evidence of that, because if you want to start testifying, we did not want to sign Amendment No. 3. And the second thing is that they have no choice in the matter. And that is really the part where, regardless of the good faith or bad faith, the government should win on duress, because there was a choice. The choice was, don't sign this amendment, purporting to take care of the issue, or purporting to take care of the issue. The issue they could have kept negotiating. They could have either kept negotiating or, frankly, filed suit. They could have said, the government has failed to negotiate good faith. They have breached a contract. We're going to sue. Instead, they signed Amendment No. 3, which purported to take care of the requirements of Section No. 21 of the CAC, and therefore would have disposed of the litigation. And then, several months later, they filed a suit, saying, we did this under duress. We can always do it later. The point is that, at the time they signed it, it said, this complies with Section 21 of the CAC. We're basically taking care of the business here at hand. Thank you, Mr. Pratt. Let me just ask one question. In Judge Braden's opinion, she mentions, in light of the fact that WAPA did not produce or introduce WAPA cost data, et cetera, et cetera, et cetera, you breached the contract. What cost data is she referring to? That's the great mystery. Because there is no cost data that was upheld by WAPA in this case. That is, there was always this great allegation brought forth at trial, and it was breached in the case for debt. The government upheld that. But there was no cost data that was upheld. Certainly, when the court's experts said, I'd like this kind of data, this kind of information, we provided it. But this was not the sort of cost data that anybody who requested earlier on that already had been upheld by WAPA. We were delighted to provide it. You mentioned the court's expert. And in the court's expert report at Joint Appendix 430, the expert says, however, despite the voluminous information presented to me by the party, I have not received all of the data necessary to fully perform the ordered calculation. What data is she referring to? What she is saying is that she would like to have certain other kinds of data to perform her calculations. Unfortunately, there's no indication that such data ever existed. For example, I don't know how much money is in my bank account right now because I don't have the data. It's somebody else's bank account, I should say. I'd like to know how much they have, but I don't have the data. I don't have access to it. I might never be able to have access to it. The bottom line is that Dr. Markowitz said she would like to have more data. Certainly. It makes sense. We would like to have more information rather than less. But there is no indication that any of the data which she sought was ever in existence. You're saying she's not suggesting there that either North Star or the government withheld cost data that either of the parties had? She's not suggesting it because it wasn't the case. Could I ask you to look at page 158? As I understand it, this is part of the amendment that was ultimately executed by the parties. I guess my first question is, am I correct about that, that this is the amendment? Yes, it is, Your Honor. But what's meant there by total annual costs? Total annual costs were essentially using the cost-based methodology that it developed, which the court later said that's not a cost-based methodology, which WACA believed was a cost-based methodology. It yielded about $1.5 million per year. And that was what it meant by total costs. And that was what it sort of then used to drive back to what in-kind percentage would be necessary. Well, this was signed by both parties. Does this indicate that both parties thought this was a cost-based methodology? That is certainly what we've been claiming all along, that by signing Amendment 3, this is what North Star Steel committed itself to. All right, thank you. We'll restore your full five minutes of rebuttal. Thank you. Mr. Chabot? Yes, sir. Is that right, Chabot? Yes, sir. Is that the right way to pronounce it? Okay. Go ahead. Just before you start, in effect, Mr. Prouty is getting an additional four minutes. So if you need that, you'll also have that on your argument. Thank you very much, Your Honor. I'd like to begin by sort of throwing away my notes and answering in a little greater detail some of the questions asked by you, Your Honor, with respect to what were the cost components and what was cost-based and what wasn't cost-based. But before you do that, did WAPA withhold during the negotiations any cost data that your client requested? What we requested, Your Honor, was all documentation to support any calculation of costs that they made during the negotiating process. They came forward with— No, I'm talking about during the negotiations. Correct. Was there evidence that during negotiations your client requested cost data which was not supplied? During the negotiations, we continuously requested that they back up their—that they provide documentation for first a 20 percent figure and then for each of their iterations of what they called cost. Now, if you notice, they refer to this as— No, but just try to answer my question. Was there any data that existed during the negotiations that was withheld by WAPA and that your client requested? In the sense, Your Honor, that ultimately there was data upon which a cost calculation could be made, the answer is yes. What data was withheld? Basically, all of the data that went into what later became—or actually was concurrently being part of the FERC filing that Western was making for its cost— excuse me, for its transmission. Okay, where do I find in the record testimony that existing cost data was withheld during the negotiations? You would not because that wasn't part of our complaint. So there's no evidence in the record that they withheld any existing cost data during the negotiations? That's correct during the negotiations. Okay. That became a problem later because of—actually, what we allege in our cross-claim about the ways these costs were ultimately calculated and presented by the court's expert. So what's the bad faith during the negotiations that they didn't withhold any cost data? Oh, the bad faith during the negotiations, and we have to be clear which negotiations you're talking about. I'm talking about the negotiations that were done pursuant to the original contract before the amendment.  The bad faith there is that Western was presenting proposal after proposal after proposal that they were characterizing as cost-based, and in fact, they were not. They were market-based. We knew them to be market-based, and we told them that they were market-based. We asked for any support that would counter that, that would demonstrate to us that it was cost-based, and during that part, there was no information. So is that the only contention of bad faith, that they misrepresented a market-based methodology as being cost-based? They misrepresented that methodology, and they refused to negotiate a cost-based methodology. The entire process here, we kept saying— Did you offer them a cost-based methodology? Absolutely, Your Honor. It was $60,000. Did you include in that the wear and tear cost and the capacity cost? Yes, we did, Your Honor. There are three cost components. Where do I find in the record that you prepared a cost-based proposal that included those items that they refused to consider? That would be in the GDS report that was submitted to Western, of course, to negotiations. I'm not on the top line. No, but who testified? Who testified that during the proceedings before the Court of Federal Claims that your proposal was cost-based? During the testimony phase, that would have been Mr. Serafolian, Mr. Brine, Mr. Pecker, also— And they testified that your proposals during the negotiations included the wear and tear and the capacity costs. They took them into consideration. We had a different approach as to whether, in fact, there was wear and tear, as to whether there was, in fact, measurement. So your proposals didn't include any costs for those things because you thought they shouldn't include any costs for those things. Am I understanding the testimony correctly? There was an attempt to get an O&M component. There was an attempt to get at the AGC cost. But answer my question. Was the testimony that your proposals during the negotiations didn't include any costs for capacity or wear and tear because it wasn't thought to be appropriate to include those kinds of costs? That is correct for a slightly— It wasn't appropriate because, first, our experts, both the GDS expert during the negotiation and Mr. Plemons, who testified during the trial, subsequently, on a retrospective analysis, that the instantaneous response upon which the variability formula or theory was premised was incorrect as a matter of physics. As a matter of physics, the changes at the North Star plant occurred so quickly that the AGC system that Western was operating could not possibly respond in time. There's always a lag between fluctuations on the system and the ability of the AGC system to respond to it. And so there was, in fact—again, this was Mr. Plemons' testimony as an engineer in physics— that the wear and tear simply did not exist because the generators could not get the signal fast enough to respond to the fluctuations that the plant was registering. They were responding to overall capacity fluctuations on the entire Western system. So that even though 100 megawatts and the tremendous variability that 100 megawatts would have with respect to the North Star plant were large, when you looked at the entire system, they were relatively small. That, again, is why Dr. Barkovich said that to assign the variability component that Western did, which I think she said was a factor of 20 in terms of a multiplier of that effect, was wrong. And it just failed to recognize what, from the physics standpoint, was taking place. And your complaint is that the court's own expert included those two categories of costs that you think should be excluded, right? In terms of—yes, yes. That's one of the bases for cross-conflict, yes. Mr. Sheva, let me ask you this, and it's the same question I asked Mr. Prouty. If you lose on the breach issue, does that mean you lose on the duress issue? In other words, if the court were to conclude—it's sort of the flip side of the question you heard me ask, Mr. Prouty. If the court were to conclude that, in fact, the government did not breach the contract, do you lose on the duress issue? No, Your Honor, I don't believe that we do, and I think the court below was very wise in how it addressed that. Yeah, but the law is that one of the factors of duress is coercive action on the part of the government, right? Is that correct? That is correct. And if you take away any bad faith in the negotiations—I realize you say that's not correct, but if you remove any bad faith in the negotiations, in other words, if you say the government did enact in bad faith in negotiations, how can there be any duress in signing Amendment 3? Lack of good faith with respect to Amendment 3 is only one of the three tests under— Well, yeah, but you've got to meet them all. You've got to meet all three. My point is I understand that you say there was bad faith. I'm just trying to really get to—it seems to me the key issue here is the breach, because if we conclude that the Court of Federal Claims was correct, then you're in a strong position on the duress. If, on the other hand, we conclude that the Court of Federal Claims erred on the breach, I think you were out of luck on the duress. There were multiple breaches, Your Honor. There was first the breach to not apply a cost-based methodology. That's what the Court of Federal Claims found. That's correct. And with respect to that, I think the Court was quite correct in concluding that you did not need lack of good faith or duress with respect to that. It was a matter of fact. Her expert testified to that. Our expert testified to that. Our labor business testified to that. Their expert didn't even contest it. Well, where's that in the contract? Where does the contract require use of a cost-based methodology? Section 21. What language? It says it requires the parties to negotiate in good faith. A cost-based methodology. But that doesn't mean that they have to use a cost-based methodology, does it? Well, I think that's certainly what the intent, that clearly was the intention, Your Honor. Why would they negotiate in good faith a cost-based methodology if they weren't going to use the cost-based methodology? It was clear going into this that the 20 percent figure was not a cost-based methodology. It was a number that the government admits was derived from calculating market replacement costs, which they would never incur. So your argument is the government had an obligation to present a cost-based methodology, and if it couldn't do it, it was in breach of the contract. That's correct. That's correct. And it was possible to do it, as ultimately was proven to be the case. They were doing it at FERC, more or less simultaneously with negotiating this contract. And when we came around to negotiating Amendment No. 3, the argument or the suggestion was made a little earlier here, that Amendment No. 3 indicates that this is compliance with Section 21. That's not true at all. So, Mr. Chabot, you agree then with the Court of Federal Claims, which I'm looking at 57 through 58 of the joint appendix, the decision. The Court of Federal Claims says, in light of the fact that WAPA did not produce or introduce WAPA cost data to establish whether its regulatory services to Northstar were cost-based, and two, expert testimony confirmed WAPA did not establish a rate of regulatory services that was cost-based. So you're saying the Court of Federal Claims there is saying the government didn't act in bad faith and breach the contract because it didn't produce cost-based data and it didn't establish a cost-based rate. That's correct. But doesn't there have to be, though, a finding that there was, in fact, such cost-based data that was not disclosed? I mean, because I think Judge Dyke is correct. He points out the fact that the parties had to negotiate a—the idea was we'll try to negotiate a cost-based methodology for the follow-on year or the follow-on period. And what the Court of Federal Claims seems to be saying is the government breached that because it didn't present any cost-based data and it didn't use a cost-based methodology. But if, in fact, it couldn't or it couldn't come up with it in good faith, doesn't there have to be some finding here that evidence was intentionally withheld or that there was data that wasn't withheld? If they're trying to come up with it and they can't, that's not bad faith. Unless the answer is, as Mr. Clements testified, that there, in fact, were no extrinsic costs incurred. Yeah, but that's all ex post facto. I mean, that's expert testimony after the fact. I mean, the government had an expert that came in and said X. The other side had an expert that came in and said Y, assuming they all testified honestly to the best of their expertise. That doesn't mean that during the period of the contract, the government or North Star was acting in bad faith. This was a tough cookie. You know, nobody – this was uncharted territory. It looked to me like a case where the parties, you know, they negotiated firmly and they just couldn't work out a deal. Well, Your Honor, first off, there are dozens of these bills throughout the country. They impose the same – the physics of each plant is the same throughout the country. Other utilities are capable of calculating whether or not this has any effect. But you see, the Court of Federal Claims didn't make a finding. The Court of Federal Claims didn't. Neither you nor the government challenges the Court's findings, leaving aside the damages issue that you cross-appeal.  And there's no finding in there, as far as I can tell, that the government intentionally withheld something or didn't come forward with material that it had or acted with animus. There's none of that. And that's, I think, what you need to have a breach of the obligation to negotiate in good faith. But, Your Honor, again, I think the way she divides her decision was – separates those issues out. The negotiation of the good faith obligation is with respect to what occurred when we were forced to sign Amendment 3. It has nothing to do with whether or not we were ever charged the cost-based rate to begin with. Are you saying, then, that the government would breach this contract simply by not producing a cost-based methodology, independent of any showing of bad faith? Yes, Your Honor, because it was, in fact, capable of coming up with a cost-based methodology. Well, then, you're saying there's bad faith. But, I mean, if it can't – she didn't find that it could. She just said – I mean – With respect to the first finding of breach, the failure to provide a cost-based rate, that's correct. She did not make the finding. But that's what she had to find. I don't believe that that's what aviation contractors, guard workers – Yeah, but the only way you can breach this agreement, the only way either North Star or the government could breach this agreement is to negotiate in bad faith. And there's not a finding here that either North Star or the government negotiated in bad faith in the effort to try and arrive at a cost-based methodology. Well, I believe there's definitely that finding with respect to the finding. Well, she says that she equates not presenting it with bad faith. Oh, I think she finds much more than the failure to present the evidence here. Where? Take a look at – That's the difficulty that I have. In that section of her opinion, right before – I think it's at the discussion of J58-59 where she's discussing how there was no other alternative. Well, yeah, but that doesn't talk about negotiating in good faith. Now we're getting into the duress issue. But, I mean, this isn't – I mean, I don't see here what – I mean, I kept looking for the critical finding that the government acted in bad faith by withholding information or not presenting information that it had or so forth, and I don't see it in here. Or acted with animus. This just looked like a case of tough negotiations, and they didn't work out. There was more going on here, Your Honor. I think you have to look at the entire page. You have an internal memorandum from Rooster Rielsen saying, by the way, we know that this 20 percent figure has nothing to do with cost, even though we put it that way. We've got a memorandum from the head of the negotiating team. She didn't point to that as finding bad faith. I mean, you know, look, you can go through files, and, you know, these were tough negotiations. But there's no finding here of bad faith. Well, Your Honor, again, I believe that on the totality of her decision that is what she does conclude. But to follow up on what Judge Schall is discussing, I mean, clearly there was no specific finding of bad faith in connection with the section of the opinion dealing with the breach. That's correct. So then if we look to the section dealing with duress, the court refers to the three Rumsfeld factors, the third of which is circumstances for the result of another party's coercive actions. Then she makes reference to the fact that a coercive action requires the showing of a breach contract without a good faith belief, et cetera, et cetera. And then when it comes to this in the discussion in the opinion on that factor, which is item C on page 48 of her opinion, simply says that the amendment was not cost-based. It doesn't say it was the result of bad faith negotiations or the government failed to come forth with a cost-based proposal and acted in bad faith. It simply says it wasn't cost-based. So, again, even in the duress section where there is a passing reference to good faith, there is no finding that the government acted in bad faith. So aren't we left with the total absence of any finding anywhere in the opinion, even looking at the opinion in its entirety on that critical point? And it's no bad faith, no breach. Your Honor, again, I think there's an extrinsic standard set up in the contract with respect to the cost-based rate, which does not require bad faith to be violated. Bad faith does become an issue with respect to whether or not, but it's only one of three components as to whether or not amendment number three was a utility arrest. Thank you, Mr. Shebo. Thank you, Your Honor. Mr. Prouty, you have your rebuttal. I do, and I'll be brief. Primarily, the issue that Mr. Shebo brought up about the notion that WAPA was required to come forward with a cost-based methodology is really, when you look at Section 21 of the CAC, it demonstrated not to be WAPA's responsibility. It's a party that shall jointly establish, and there's no indication whatsoever, as has been demonstrated by Your Honor just now, that there was a cost-based methodology proposed during the negotiations by North Star Steel. We're not saying North Star had bad faith, but certainly WAPA, I think, in very good faith, doing the best it could with proposals and counter-proposals and seeking to provide the best evidence it had to address the matters. And certainly, Dr. Bartovich later got additional information from the parties that was not provided during the negotiations, but it was because this sort of information was not requested by any of the parties. Nobody thought, for example, that the capacity factor that we began was necessary for determination of what a cost-based methodology would be used. Dr. Bartovich was unique in doing this, and applause to her for using a different way of doing things, but obviously the government's not anticipating something that an expert 10 years later would use. It's sort of not evidence of bad faith. Because there is no bad faith, there is no breach by the government of the criminal court's opinion or judgment of shooting of a person. Thank you. Thank you. Thank you, Mr. Priority. Thank you, Mr. Chabot. The case is submitted.